IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JULIAN M. REYES, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | 1:15-CV-327-RP |
| | § | |
| CITY OF AUSTIN, DANIEL WALSH, | § | |
| *individually*, CHRISTOPHER ANDERSON, | § | |
| *individually*, HUBERT "ART" ACEVEDO, | § | |
| *individually and in his official capacity, and* | § | |
| MARC OTT, *individually and in his official* | § | |
| *capacity*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment, (Dkt. 87 & 92). After

reviewing the parties' submissions, the relevant law, and the factual record, the Court issues the

following order.

## BACKGROUND

Plaintiff Julian Reyes ("Reyes") brings this civil action against Defendants City of Austin

("the City"), Officer Daniel Walsh ("Walsh"), Officer Christopher Anderson ("Anderson"), Austin

Police Chief Hubert "Art" Acevedo ("Acevedo").[1]

Reyes, an Austin resident, does not have a house. Instead, he and his companion dog Shiner

Bock lived together in Reyes's truck. (Fourth Am. Compl., Dkt. 47, ¶ 12). At midnight on April 25,

2013, Reyes and Shiner Bock were at Reyes's rented storage unit, (*id.* ¶ 29), when Walsh and

Anderson and several other Austin Police Department ("APD") officers were called about a

"banging noise" and suspected theft at a construction site nearby. (*Id.* ¶ 30).  After arriving at the

---

[1] Plaintiff has indicated that he does not oppose dismissal of the claims he initially brought against
City Manager Marc Ott.

storage facility, the officers parked their cars outside the facility's gate while they awaited a K9 unit that could help them investigate. (*Id.* ¶ 32). The officers determined the banging noise was caused by "the wind blowing a piece of loose aluminum siding at an unsecured construction site located near the front, left side of the storage facility." (*Id.* ¶ 31).

Rather than wait outside the facility with the other officers, Walsh drove his vehicle past the marked boundary line. (*Id.* ¶ 33). He parked his vehicle "near the back" of the facility, exited, and approached Reyes's storage unit on foot. (*Id.* ¶¶ 34, 36). Upon getting closer, he heard Shiner Bock's bark and saw the dog standing outside the unit. (*Id.* ¶ 40). He shouted, "Don't move! Get back!" (*Id.* ¶ 41). Shiner Bock barked again, and Walsh shot him in the chest. (*Id.*). Shiner Bock bled to death. (*Id.* ¶ 42).

After the gunshots, Reyes "calmly exited his storage unit." (*Id.* ¶ 48). Walsh pointed his gun at Reyes and forced him to the ground. (*Id.* ¶ 49). Having heard gunshots, the other officers entered the storage facility and ran from the front gates to Reyes's unit. (*Id.* ¶ 52). Anderson handcuffed Reyes. (*Id.* ¶ 53). Walsh then searched Reyes's person. (*Id.*). Contemporaneously, Walsh and Anderson searched Reyes's storage unit and truck. (*Id.* ¶ 54). Reyes "repeatedly asked the officers what had happened to Shiner Bock." (*Id.* ¶ 56). Eventually, an officer stated, "Your dog is dead." (*Id.*). Reyes remained handcuffed for "several minutes." (*Id.* ¶ 57). Even after his eventual release from handcuffs, "[Reyes] did not feel free to leave the scene because numerous officers remained around his car and storage unit, and they continued to question him." (*Id.* ¶ 58). Additionally, he did not feel free to leave because of his prior "violent restraint" and the officers' "use of lethal force against Shiner Bock." (*Id.*).

Plaintiff asserts eight counts against the Defendants, the Court having dismissed two. (*See* Dkt. 56). He invokes his Fourth and Fourteenth Amendment rights to claim Defendants have unreasonably searched and seized his property, unlawfully seized him, failed to train and supervise

APD officers and adopted policies causing violations of his constitutional rights, and failed to provide procedural due process. He further asserts a claim under state law for theft. The Court previously dismissed two state law claims for negligence and negligent training and supervision.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). The court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

**DISCUSSION**

Plaintiff opposes Defendants' motions for summary judgment on all grounds except as to Counts 3 and 4 of his complaint, which concern an allegedly unreasonable search. Accordingly, the Court grants summary judgment in Defendants' favor on these claims and will consider the parties' arguments concerning the remaining counts.

**1.      Count 1: Unreasonable Seizure of Property**

In Count 1, Plaintiff alleges that Defendant Walsh unlawfully seized his property in violation of his Fourth Amendment rights when Walsh fatally shot Shiner Bock. Defendants contend that Walsh's shooting of Shiner Bock was objectively reasonable under the circumstances, and that Walsh is therefore entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). There are two steps to determining whether a defendant is protected by qualified immunity. *See Saucier v. Katz*, 533 U.S. 194 (2001). First, the court asks whether the official "violated a statutory or constitutional right." *Morgan*, 659 F.3d at 371 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). Second, the court asks whether "the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2083). A court may, at its discretion, skip the first step and begin its analysis by asking whether the right in question was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Finally, "[e]ven if the government official's conduct violates a clearly established right, the official is entitled to qualified immunity if his conduct was objectively reasonable." *Davis v. McKinney*, 518 F.3d 304, 317 (5th Cir. 2008).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then

shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." *Id.* (internal citations omitted).

To support entitlement to qualified immunity, Defendants describe a tense situation that rapidly unfolded outside Plaintiff's unlit storage unit. Upon approaching a suspicious scene where Plaintiff's truck was backed up to the dark unit, Defendants assert that Walsh was surprised by Shiner Bock's sudden appearance. According to Defendants, the dog was growling, barking, showing his teeth, and had assumed an aggressive posture. Defendants argue that these facts establish that Walsh is entitled to qualified immunity under Fifth Circuit authority, specifically *Stephenson v. McClelland*, 632 F. App'x 177 (5th Cir. 2015), and *Grant v. City of Houston*, 625 F. App'x 670 (5th Cir. 2015).

In *Stephenson*, for example, an officer responded to a 911 call reporting a man brandishing a gun on a residential street. 632 F. App'x at 179.[2] When the officer arrived on the scene, he noticed an individual who appeared to match the caller's description, though he could not see whether the individual had a gun. *Id.* When he exited his patrol car, the officer commanded the individual to stop and show his hands, but the individual did not comply and instead began to move away from the car and toward the nearby house. *Id.* Feeling concerned for his safety, the officer drew his weapon and approached the individual. *Id.* As he did so, he was surprised by a fifty-pound, three-year-old boxer, which, according to the officer, bared its teeth and jumped on him. *Id.* at 180. The individual testified, on the contrary, that the dog was friendly, did not jump, and was only "smiling" at the officer. *Id.* The officer felt threatened by the dog and fired a single shot at the dog, killing it. *Id.*

---

[2] The Court recognizes that *Stephenson* is not precedential. It remains persuasive authority, however, and perhaps the best indication of how the Fifth Circuit would view the facts of this case.

The Fifth Circuit held that the plaintiffs' evidence was insufficient to demonstrate that a constitutional right was clearly established such that a reasonable officer would have understood that his conduct violated that right. *Id.* at 185. The court based this holding on three primary facts. First, the officer did not know there would be a dog present and was surprised when it appeared. *Id.* Second, even if the plaintiffs knew that the dog was not aggressive, the officer did not. *Id.* Third, the officer was startled by a large dog that was showing its teeth. *Id.* Because the officer had to make "a split-second judgment in a tense situation and acted to protect himself," the court concluded that the officer was entitled to qualified immunity. *Id.*

It is difficult to escape the parallels between the facts of this case and those of *Stephenson*. Walsh was responding to a report of a possible burglary. He noticed a truck backed up to an open and unlit storage unit. Suspecting that a burglary might be in progress, he approached the unit. When he did so, he was surprised by Shiner Bock, a German Shepherd. Shiner Bock approached the officer, barked, growled, bared his teeth, and assumed an aggressive stance. These facts are similar to *Stephenson*, which leads this Court to conclude that Walsh is entitled to qualified immunity here.

Plaintiff's contrary evidence does not suffice to raise a genuine fact dispute on this issue. First, while not disputing that the situation was fluid and tense, Plaintiff argues that this fact should not benefit Walsh because the evidence shows he wrongly created the exigency by failing to heed department protocol. (Pl.'s Resp., Dkt. 97, at 10). However, "[i]n the Fifth Circuit, police officers are not liable under the Fourth Amendment for negligently creating circumstances leading to an otherwise justified shooting." *Schaefer v. Whitted*, 121 F. Supp. 3d 701, 713 (citing *Young v. City of Killeen*, 775 F.2d 1249 (5th Cir. 1985)). Walsh's purportedly negligent departure from police protocol therefore does not affect whether his ultimate decision to shoot Shiner Bock was constitutionally reasonable. *See id.*; *Fraire v. City of Arlington*, 957 F.2d 1268, 1275–76 (5th Cir. 1992) (quoting *Young*, 775 F.2d at 1352) ("On appeal, we noted that '[t]he sense in which [the district court] finds excessive

force is that the force would have been avoided if [the policeman] had approached Young as required by proper police procedures.' We found to the contrary, however, that regardless of what had transpired up until the shooting itself, Young's movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.'").

Plaintiff next argues that a jury could conclude that Walsh acted unreasonably in failing to attempt non-lethal means of subduing Shiner Bock. Though perhaps Walsh could have effectively handled the situation without the use of lethal force, the law does not permit a review of his actions with the benefit of hindsight; rather, his actions must be evaluated from the perspective of a reasonable officer in his situation, taking into account "the difficult and often split-second decisions that police officers must make in carrying out their duties." *Lytle v. Bexar Cty.*, 560 F.3d 404, 411 (5th Cir. 2009). The Court must therefore ask not whether non-lethal force *might have* worked, but instead whether lethal force was justified when employed. *See id.* In *Stephenson*, the Fifth Circuit found that the use lethal force on facts similar to those presented here did not deprive the officer of qualified immunity. *See* 632 F. App'x at 184–85. This Court therefore finds that Walsh's failure to attempt non-lethal force does not defeat his entitlement to qualified immunity.

Plaintiff's fourth argument—and his most substantial—is that there is a fact dispute about whether Shiner Bock objectively posed a threat to Walsh that may have justified his use of force. Plaintiff first points to a statement made by Walsh that Shiner Bock was not moving toward him immediately before the shooting. (Walsh Dep. 163:22–164:6, Dkt. 97-3). The evidence on this point is not entirely clear. While true that Walsh stated at his deposition that Shiner Bock was stopped in an aggressive stance at the moment of the shooting, Plaintiff conceded that Shiner Bock had approached the officer before that point, even if he was not charging the officer at the time of the shooting. (Reyes Dep. 99:21–100:7, Dkt. 92-4). Additionally, shortly after the shooting, Walsh told his supervisor that Shiner Bock was moving toward him and was close enough to quickly charge and

reach him before he shot the dog. (DMAV Video, 00:28:02–00:28:24, Dkt. 92-1 Attach. 5). This fact was not included in his report, however. (Police Report, Dkt. 92-3, at 9). Thus, whether Shiner Bock was approaching Walsh at the moment of the shooting or immediately before is unresolved.

This factual ambiguity again recalls *Stephenson*. In that case, the officer claimed that the dog jumped at him, though one of the plaintiffs, standing nearby, maintained that the dog never jumped at the officer during the encounter. 632 F. App'x at 184. Because the issue was disputed, it was not relevant to the Fifth Circuit's decisional calculus in affirming summary judgment. Nonetheless, the court found that the officer was entitled to qualified immunity exclusively on the following facts: (1) the officer was unaware there would be a dog present; (2) the officer did not know the dog was friendly; (3) the officer was startled by a large dog, (4) that the dog was baring its teeth, and (5) that the officer was required to make a split-second decision in a tense situation. *Id.* at 185.

Each of these facts is both present here and undisputed. First, Walsh could not have expected Shiner Bock to be present. Second, though Plaintiff has asserted that his dog was gentle and friendly, this fact, even if true, could not have been known to Walsh. Third, Walsh was startled by a relatively large German Shepherd that had emerged from a dark storage unit late at night. Fourth, Walsh has testified that Shiner Bock was baring his teeth, growling, and barking. The DMAV audio confirms that Shiner Bock was barking and growling, and Plaintiff has put forward no evidence that the dog was not baring his teeth. Finally, as can be readily inferred from the DMAV audio, the encounter between Shiner Bock and Walsh unfolded in a matter of seconds. Following *Stephenson*, this Court finds that a fact dispute over whether Shiner Bock was moving toward Walsh at the moment of the shooting is not a material one, and it does not undermine Walsh's entitlement to qualified immunity.

Plaintiff attempts to rebut Defendants' version of events with an argument that their evidence suffers significant credibility issues. The Court, however, finds these concerns to be

exaggerated. For example, Plaintiff asserts that Walsh has given conflicting accounts of Shiner Bock's behavior, stating in his declaration that the dog was in an aggressive posture and was snapping its jaws despite failing to mention the dog's posture at the scene or in his report and conceding that it was too dark to see the dog's details. (Pl.'s Resp., Dkt. 97, at 6). But, in fact, Walsh mentioned at the scene that Shiner Bock was "hunched forward." (DMAV Video 00:28:02–00:28:03, Dkt. 92-1 attach. 5; Dog Behavior Powerpoint, Dkt. 87-3, at 31 (describing "[b]ody lowered, crouching position" as characteristic of high-risk defensive posture)). And although Walsh stated at that time that he could not see if Shiner Bock's hackles were raised, he stated that he could nonetheless see the dog's teeth. (*Id.* 00:28:40–00:28:48).

Plaintiff next suggests that Walsh's supervisor coached Walsh on how to describe the events leading up to the shooting in his police report. This is partially true: someone can be heard on the DMAV audio advising Walsh on what details to include in his report. (*Id.* 00:28:36–00:28:52). But the supervisor did not pull these details from the air; rather, he told Walsh to include details that Walsh had already shared without coaching. (*See id.*). Notably, Plaintiff does not contend that Walsh's report diverges in any significant way from the narrative he offered on the scene prior to his supervisor's purported coaching.

Plaintiff's final argument concerns Anderson's explanation of Shiner Bock's shooting to Plaintiff at the scene. In a terse, if not discourteous, exchange with Plaintiff, Anderson can be heard on his DMAV (dashcam) audio telling Plaintiff that his dog had growled and charged at Walsh just prior to the shooting. Plaintiff asserts that this is notable for several reasons. First, it is partially untrue, or at least mistaken: Walsh at no point claimed that Shiner Bock "charged" at him. Second, Plaintiff contends that Anderson neither witnessed the shooting nor discussed it with Walsh before Anderson offered his justification to Plaintiff. The apparent suggestion is that Anderson fabricated

the narrative, casting doubt on whether Walsh's explanation is an accurate version of events rather than a department practice of offering a pro forma justification in dog-shooting cases.

The evidence does not support Plaintiff's concerns, however. It is apparent from Anderson's DMAV audio that both Anderson and Walsh were standing next to Plaintiff when Walsh initially recounted the events to Plaintiff. (Anderson DMAV 00:09:25–00:09:29, Dkt. 97-9).[3] In particular, Walsh explained that, when he approached the unit, Shiner Bock began growling and started "coming toward [him]." (Id.).[4] Shortly thereafter, Anderson repeated to Plaintiff what he might reasonably have understood Walsh to mean when he said Shiner Bock was "coming toward [him]." (Id. 00:10:20–00:10:27). This might betray a tendency of Anderson to embellish—particularly given his assertion to Plaintiff that APD had previously investigated burglaries of *these* storage units,[5] which the evidence does not support—but it does not undermine Walsh's credibility or cast doubt on the accuracy of his report. Indeed, Walsh did not claim that Shiner Bock had charged him in his report, and no Defendant currently suggests that the contrary is true.

These facts thus provide only the weakest support for Plaintiff, and nothing in Plaintiff's cited authorities changes this conclusion. In *Jones v. Lopez*, for example, the Fifth Circuit found a fact dispute to exist where the plaintiffs witnessed the officers shooting their dog multiple times as the dog was running away, contradicting the officers' explanation that they shot the dog when it charged. __ F. App'x __, 2017 WL 2126353, at *3 (5th Cir. May 15, 2017). In *Kincheloe v. Caudle*, too, an eyewitness contradicted the officer's claim that a dog charged him by providing evidence that the dog was sitting next to the family's porch before walking slowly toward some nearby bushes when shot. 2009 WL 3381047, at *8 (W.D. Tex. Oct. 16, 2009). Here, the only evidence Plaintiff has

---

[3] The Court infers that both officers were present in close proximity because both Walsh's and Plaintiff's voices can be heard on Anderson's DMAV video, and because both Walsh and Anderson engaged with Plaintiff within a short period of time.
[4] Walsh's statements can be heard more clearly on his own DMAV video. (Walsh DMAV 00:09:05–00:09:08, Dkt. Dkt. 92-1 Attach. 5).
[5] (Anderson DMAV 00:09:26–00:09:49, Dkt. 97-9).

provided to rebut Walsh's version of events is his belief that Shiner Bock was a gentle and friendly dog. This does not establish a genuine fact dispute. *See Stephenson*, 632 F. App'x at 185.

In sum, the Court finds that Plaintiff "ha[s] not produced sufficient evidence to demonstrate that a constitutional right was clearly established such that a reasonable officer in [Walsh's] situation would have understood that his conduct violated that right." *Stephenson*, 632 F. App'x at 185. The Court therefore finds that Walsh is entitled to qualified immunity on Plaintiff's Fourth Amendment claim concerning the seizure of his dog, and summary judgment is therefore appropriate.

## 2. Count 2: Unlawful Seizure of Plaintiff

In Count 2, Plaintiff alleges that Walsh and Anderson unreasonably seized him when they ordered him to the ground at gunpoint, applied handcuffs, and left him face down on the ground for up to fifteen minutes before removing the handcuffs and continuing an interrogation. Plaintiff argues that this detention was unreasonably intrusive, amounting to an arrest without probable cause. Plaintiff also challenges the existence of reasonable suspicion to detain him. Defendants, by contrast, argue that they effectuated only an investigatory detention that was reasonable under the circumstances.

The Court finds it impossible to conclude that Defendants lacked reasonable suspicion to conduct an investigatory stop of Plaintiff. An investigatory stop is justified "if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted). An "officer's mere hunch will not suffice." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Rather, reasonable suspicion exists when the officer can point to "specific and articulable facts which, when considered along whatever reasonable inferences may be drawn from them, would allow a reasonable person to suspect . . . illegal activity." *Id.* at 433; *see also Arvizu*, 534 U.S. at 273 (2002) (explaining that the reasonable suspicion inquiry requires courts to look to "the

totality of the circumstances" to determine "whether the detaining officer has a 'particularized and objective basis' for suspected legal wrongdoing").

In this case, several factors supported Walsh's belief that Plaintiff might have been involved in criminal activity. First, the officers were responding to a 911 call reporting a possible burglary in a construction site near Plaintiff's storage unit. (911 Call, Dkt. 92-1 Attach. 4). Finding an SUV backed up to an open and unlit storage unit at midnight is reasonably suspicious in light of the officers' belief that burglary might be in progress. Additionally, as Walsh approached, he noticed that the back door of the SUV was open as well, reasonably suggesting that someone was in the process of loading it. Taking these facts together, Walsh might reasonably have suspected that Plaintiff was engaged in criminal activity. At the very least, his presence at a private storage facility at midnight suggests he might have been trespassing.[6]

Having determined that reasonable suspicion existed to detain Plaintiff for investigation, the Court must next examine whether the means by which Defendants detained Plaintiff—specifically, their use of firearms, handcuffs, and leaving him prone on the ground—were constitutionally reasonable. In *United States v. Sanders*, the Fifth Circuit held that the use of firearms, handcuffs, or ordering a suspect to lie prone, whether occurring separately or in combination, does not automatically convert an investigatory stop into an arrest. 994 F.3d 200, 206. But the court cautioned that its holding "is not to be interpreted as meaning that the police are automatically authorized to employ these procedures in every investigatory detention." *Id.* Instead, it emphasized that the relevant inquiry "is always one of the reasonableness under the circumstances" and that courts "must determine case by case whether the police were unreasonable in failing to use less intrusive procedures to conduct their investigation safely." *Id.* at 206–07.

---

[6] Though, since the storage facility was presumably open for Walsh's access, Plaintiff's presence alone is also consistent with his lawful access to the storage unit.

The Court is satisfied that the evidence before it creates a fact dispute as to the reasonableness of Defendants' actions. Unlike in *Sanders*, and each of the cases it cites as supporting the use of firearms and handcuffs in an investigatory stop,[7] Defendants had no reason to believe that Plaintiff was armed, dangerous, or otherwise a flight risk. *See id.* at 207 (suspect reported to carry gun, jacket concealed his waistband, possessed paper bag that could contain alcohol or weapon). On the contrary, the DMAV audio demonstrates that Plaintiff was compliant at all times, respectful, and answered all of the officers' questions. Additionally, Defendants concede that Walsh and Anderson performed a protective sweep of the Plaintiff's car and storage unit, which should have further allayed any concerns that Plaintiff posed a threat to the officers or was involved in criminal activity. (*See* Walsh Depo., Dkt. 92-5, at 189:12–18 (noting that a protective sweep was done either before or directly after cuffing Plaintiff); *id.* 192:10–193:1 (noting that no "burglary" tools or potentially stolen items discovered in search)).

A reasonable factfinder could conclude that Defendants' conduct was unreasonable under these circumstances. Stated differently, a jury could find that Defendants' actions—including ordering Plaintiff to the ground at gunpoint, handcuffing him, and maintaining firearms trained on him—were not justified by any reasonably perceived threat. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 694–95 (5th Cir. 2017) (finding use of handcuffs and detention in patrol car unreasonable

---

[7] *See United States v. Hensley*, 469 U.S. 221 (1985) (armed approach appropriate in traffic stop of armed robbery suspect); *United States v. Sharpe*, 470 U.S. 675 (1985) (armed approach appropriate where suspect attempted to elude a traffic stop); *United States v. Maslanka*, 501 F.2d 208 (5th Cir. 1974) (weapon drawn in stop of car after high-speed chase as part of *arrest* of driver); *United States v. Worthington*, 544 F.2d 1275 (5th Cir. 1977) (officers approached airplane of suspected drug trafficker with weapons drawn, though not necessarily pointed at suspect); *United States v. Bautista*, 684 F.2d 1286 (9th Cir. 1982) (handcuffs reasonable to detain armed robbery suspects whose nervous demeanor suggested a flight risk); *United States v. Thompson*, 597 F.2d 187 (9th Cir. 1979) (handcuffing reasonable where suspect twice disobeyed officer's orders by reaching inside coat pocket); *United States v. Taylor*, 716 F.2d 701 (9th Cir. 1983) (armed approach and handcuffs reasonable where one suspect known to be dangerous and other refused to comply with order to raise hands); *United States v. Glenna*, 878 F.2d 967 (7th Cir. 1989) (handcuffing reasonable after discovering loaded clip for firearm in suspect's pocket); *United States v. Purry*, 545 F.2d 217 (D.C. Cir. 1976) (handcuffing reasonable after suspect attempted to flee).

where, among other things, the suspect had no weapon, was not behaving in a threatening way, and did not otherwise pose a threat). In these circumstances, while it may have been reasonable to detain Plaintiff for investigation, holding that it is reasonable to maintain him prone on the ground, in handcuffs, and at gunpoint, would impoverish the Fifth Circuit's admonition that "police are [not] automatically authorized to employ these procedures in every investigatory detention." *Id.*

Because "a reasonable person in [Plaintiff's] position [might] have understood the officers' actions 'to constitute a restraint on [Plaintiff's] freedom of movement of the degree which the law associates with formal arrest,'" *see Turner*, 848 F.3d at 694, and because Defendants do not contend they had probable cause to arrest Plaintiff, the Court concludes that sufficient evidence exists for a factfinder to conclude that an unlawful arrest had occurred. Additionally, because Plaintiff's right to be free from arrest without probable cause was clearly established, *see Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009), the Court is unable to find that Defendants are entitled to qualified immunity on this claim.

For these reasons, the Court denies Defendant's motion for summary judgment as to Count 2.

### 3.    Count 5: Failure to Train & Supervise

Plaintiff asserts his fifth cause of action against the City and Acevedo, alleging a failure to train and supervise resulting in a constitutional violation. Defendant contends that Plaintiff lacks sufficient evidence to support this claim.

It is well established that "[l]iability under the doctrine of *respondeat superior* is not congnizable in § 1983 actions." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010). However, supervisors and municipalities may be liable for constitutional violations that result from their own wrongdoing, including the failure to adequately train or supervise employees. *See id.* To prevail on a failure-to-train claim, a plaintiff must establish that: (1) the defendant's training policy procedures

were inadequate, (2) the defendant was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the constitutional violation. *See id.* at 381.

As discussed below, the Court agrees with Defendants that Plaintiff's evidence in support of this claim fails to demonstrate a material fact dispute. Plaintiff relies on several sources of evidence to show the inadequacy of Defendant's training policy. First, Plaintiff offers evidence demonstrating that APD officers shot approximately twenty-one dogs in 2012. Second, he offers an email from police officer Chantal Locke to Acevedo. In that email, the officer relayed her opinion that APD "needed something in place, to educate [its] officers on how to deal with animal encounters" because she believed the officers were "too quick to shoot some dogs and some officers create situations where it could have been avoided." (Locke Email, Dkt. 94-12). She confided that she had "seen a few things that left [her] disgusted with some fellow officers, regarding the manner in which they handle animal calls." (*Id.*). Third, Plaintiff's expert, who specializes in animal-encounter training for law enforcement agencies, has identified several purported inadequacies of the APD training. Finally, Plaintiff suggests that the length and format of the training were inadequate, that APD's failure to follow up on the training unreasonable, and that later improvements made to the program demonstrate its initial deficiency.

These facts do little to establish constitutionally inadequate training. First, Plaintiff offers no evidence to establish how many of the twenty-one dog shootings represented constitutional violations. In the absence of any judicial review or other independent factfinding regarding these incidents, the Court is left to draw inferences from only the APD reports. Having reviewed many of them, the Court cannot conclude that they establish any pattern of constitutional violations that might suggest inadequate training. On the contrary, the officers' reports appear to describe

objectively reasonable use of force.[8] Though not accepting these narratives unquestioningly, the

Court emphasizes that it lacks any evidence upon which to reach a contrary conclusion. *See Peterson v.*

*City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) ("[E]leven incidents of warrantless entry did not

support a pattern of unconstitutional warrantless entry. In each of those eleven incidents, officers

reported either consent or exigent circumstances.").

Second, Officer Locke's email to Defendant Acevedo provides some evidence that several

incidents of police use of force against dogs may have been unreasonable. However, the evidence is

weak at the outset because it represents the opinion of a single officer on the basis of only a few

incidents she had observed. *Connick v. Thompson*, 563 U.S. 51, 62–63 (2011); *Peterson*, 588 F.3d at 851.

The probative force of the email is further undermined by the undisputed fact that APD was not

unresponsive to the concerns Officer Locke raised. Plaintiff acknowledges that APD instituted

mandatory training in the time following the email, and it is uncontested that Walsh received this

training. This is a crucial point: even if Plaintiff had established that each of the twenty-one dog

---

[8] (*See, e.g.*, Wooldridge Report, Dkt. 94-5, at 20 (responding to dog bite call, officer shot unleashed
and charging pit bull that already attempted to bite another officer); Lomovstev Report, *id.* at 43
(responding to dog attack call, officer fired shotgun at three fighting pit bulls when two growled at
him and one began to approach); Acosta Report, *id.* at 60 (firearm used when non-lethal force failed
to subdue dog that attacked woman and another dog); Lane Report, *id.* at 91 (officer shot charging
dog that recently bit mailman); Hittner Report, *id.* at 117 (officer shot dog that charged him after
attacking a man and another dog); Rodriguez Report, *id.* at 135 (officer shot dog that bit him and
had his arm grasped in jaws); Herring Report, *id.* at 178 (officer shot dog that barked, growled, bared
teeth, and approached him after attacking another dog); Conwell Report, *id.* at 202 (officer shot at
charging dog that had bit another man); Powell Report, *id.* at 225 (officer shot aggressive dogs that
had attacked man, lunged at Animal Control personnel, and charged at officer); Gilbertson Report,
*id.* at 284 (officer shot dog that bit him and pursued him); Parnell Report, *id.* at 342 (officer shot dog
that attacked him twice); Whitehead Report, *id.* at 380 (officer shot charging dog that previously
attacked another dog); Beathard Report, *id.* at 403 (officer shot charging dog bearing its teeth and
charging); Willis Report, *id.* at 426 (officer shot charging and growling dog); Davis Report, *id.* at 439
(officer shot and missed aggressive charging dog); Delgado Report, *id.* at 450 (responding to report
of aggressive dogs chasing children, officers fired at dogs that charged aggressively); Menduni
Report, *id.* at 468 (officer shot charging dog); Daugherty Report, *id.* at 484 (officer shot charging and
growling dog after attempt to TASE failed); Hudson Report, *id.* at 499 (officer shot at charging dog
that had just attacked couple); Ivery Report, *id.* at 544 (officer shot charging dog that had previously
attacked another individual after pepper spray failed to deter attack); Watkins Report, *id.* at 561
(officer shot dog to stop ongoing attack on calf after non-lethal attempts failed)).

shootings in 2012 was unconstitutional and that Officer Locke's email exposed a widespread problem, it would not demonstrate that the training program thereafter adopted to address those issues was constitutionally inadequate.

On this point, Plaintiff offers an expert, Jim Crosby, who criticizes the sufficiency of the APD training program that Walsh received. Crosby's report was authored under a mistaken belief that APD offered no training at all to its officers. (*See* Crosby Report, Dkt. 97-1). At his deposition, Crosby conceded the fact that APD had a training program in place would change his opinion, and that his "only question would be whether there was sufficient penetration of that training before this incident happened as to the number of officers that have been through the training." (Crosby Dep., Dkt. 87-4, 125:8-25). Because Plaintiff must show that the inadequate training caused his injury, however, the question whether a sufficiently broad swath of the police force received the training is irrelevant to his claim; Walsh is the only officer who shot his dog, and Walsh received the training.

On the sufficiency of the training Walsh received, Crosby testified that he would not characterize it as "completely inadequate," though it could have been improved. (*Id.* 105:5-7). Though Plaintiff asserts that Crosby "identified several problems with the Memphis powerpoint training," (Pl.'s Resp., Dkt. 94, at 10),[9] nearly all of the cited discussion in the deposition concerned APD's written policy, not its training program. In one portion, Crosby stated that the presentation did not elaborate on what APD considered a "dangerous and aggressive" animal per its policy, (Crosby Dep., Dkt. 94-26, 95:24–96:2), though the training indisputably contained material discussing when a dog's behavior might indicate a threat of attack. In one portion of the deposition centering directly on the training, Crosby offered generally positive feedback, though identified a few things he would change. (*See id.* 102:10-23 ("[T]he basics in a lot of this is not necessarily bad. . . . There is a lot of decent, solid information in here.")). For example, he stated that the training's focus

---

[9] The parties refer to "the Memphis powerpoint training" because APD adopted the training program from the Memphis Police Department.

on active and passive/submissive behavior touched on a "contentious issue" in behavioral science that might confuse officers. (*Id.* 102:4-9). He also disapproved of the presentation's discussing oleum capsicum (pepper spray) and CS (tear gas) together as the effectiveness of each weapon differs: pepper spray is highly effective—which the presentation notes—while tear gas is not. (*Id.* 103:2–104:18). The final portion of the deposition Plaintiff cites concerns only APD's policy manual, not its training. (*Id.* 135:17–136:9).

These exceedingly minor points raised by Crosby do not convince the Court that there is a genuine fact dispute as to the constitutional adequacy of APD's training material. Neither does Plaintiff's remaining argument: that APD's presentation of the material over a two-hour "working lunch" with no testing or follow-up suffices to send the matter to a jury. The duration and format of the training is not so clearly deficient that those factors, standing alone, would bear on the training's adequacy. The only evidence Plaintiff provides to suggest that duration and format of the training were problematic is that Walsh did not remember that he had participated in the training at the time of his deposition. (Pl.'s Resp., Dkt. 94, at 10). But the mere fact that Walsh did not recall this training at his deposition does not establish that the training itself was inadequate. *See Connick v. Thompson*, 563 U.S. 51, 57 (2011) (finding no inadequate training of prosecutors though no prosecutor could recall any specific training).[10] Finally, the Court does not find that any later improvements made in the training program bear on whether the program, as it was, met the constitutional minimum.

---

[10] One final piece of evidence Plaintiff offers is an email from an APD district representative to Acevedo. (Jefferson Email, Dkt. 94-7). The email notes that recent dog shootings had affected certain officers mentally and that she thought APD should seek input from the officers in developing further policies. She does not reference the training program that was then in place, though she does share her opinion that officers were rushing animal calls. (*Id.*). The message does not bear on the adequacy of training; it does not demonstrate that the purported "rushing" resulted or was likely to result in constitutional violations.

Just as these facts fail to demonstrate the inadequacy of the training program, they also fall short of creating a fact dispute over whether Defendants were deliberately indifferent to the rights of citizens in their decision to adopt or maintain the training program. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

In this case, Plaintiff has provided no material evidence to demonstrate a pattern of constitutional violations. As stated above, the twenty-one dog-shooting incidents—to the extent any one was constitutionally unreasonable—occurred before the adoption of the relevant training program. And far from being indifferent to the issue, APD took steps to implement mandatory training that Plaintiff has not established to be constitutionally deficient. Additionally, Plaintiff has provided evidence of no constitutional violation following the implementation of the training program other than his own. *See id.* at 62–63 (holding that a single incident is very rarely sufficient to support deliberate indifference). And, finally, Plaintiff has put forward no evidence to suggest that decisionmakers at APD were deliberately indifferent to Plaintiff's constitutional rights in adopting the Memphis training program. It has not been suggested, for example, that Acevedo knew that the training program had been ineffective in preventing constitutional violations in Memphis, yet adopted the program anyway. *See id.* at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

The above discussion bears directly on Plaintiff's claim for failure to adequately supervise Walsh. "A plaintiff seeking recovery under a failure to train or supervise rationale must prove that the police chief failed to control an officer's 'known propensity for the improper use of force.'" *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). Plaintiff has put forward no evidence that Walsh had a known propensity for excessive force such that Acevedo would have had notice of a need to exercise greater control. It follows that Acevedo and the City could not have been deliberately indifferent to the need for supervision. *See id.*

The Court thus finds that Defendants are entitled to summary judgment on Count 6.

4.      **Count 6: Inadequate Policy**

Plaintiff's sixth count alleges that APD adopted a policy causing a constitutional violation. More specifically, he alleges that APD Policy 202.1.1,[11] which concerned use of force in encounters with animals, was the moving force behind his loss of Shiner Bock. Defendant contends that the policy itself did not suffer any constitutional infirmities, was not adopted with deliberate indifference to the risk of constitutional violations of the kind alleged by Plaintiff, and was not the cause of any constitutional violation. For the reasons that follow, the Court largely agrees.

---

[11] The relevant portion of the policy reads as follows:
    (b) To stop a dangerous and aggressive animal:

      1. In circumstances where officers encounter any animal which reasonably appears, under the circumstances, to pose an imminent threat of bodily injury to officers or others, officers are authorized to use objectively reasonable force up to and including deadly force (when lesser means would be impractical) to neutralize the threat.

      2. In circumstances in which the officers have sufficient advanced notice that a potentially dangerous domestic animal (e.g., dog) may be encountered, such as in the serving of a search warrant, officers should develop reasonable contingency plans for dealing with the animal without the use of deadly force (e.g., fire extinguisher, TASER Device, oleoresin capsicum (OC) spray, assistance of animal control). Nothing in this policy shall prohibit any officer from resorting to deadly force to control a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impracticable.

(Dkt. 87-1, attach. B).

In order to succeed on his policy claim, Plaintiff "must show, in addition to a constitutional violation, that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury," and that "[t]he official policy itself [was] unconstitutional, or, if not, [was] adopted 'with deliberate indifference to the known or obvious fact that such constitutional violations would result." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009).

Plaintiff's claim relies on several purported deficiencies in the policy's language. Accordingly to Plaintiff, the policy is deficient because it offers no guidance for determining whether an animal is "dangerous and aggressive," what level of force is "objectively reasonable," or when an animal poses an "imminent threat of bodily injury." (Pl.'s Resp., Dkt. 94, at 15). Additionally, Plaintiff asserts that the policy fails to "outline a use of force 'continuum,'" does not list less lethal options that have proven effective, does not incorporate recommended "best practices" from key authorities, and does not mention that dogs rarely cause serious injury to adults." (*Id.*). Finally, Plaintiff states that the "structure" of Policy 202.1.1's text de-emphasizes the advisability of less lethal force in unforeseen encounters with animals by failing to list the options provided in 202.1.1(b)(2).

Plaintiff is correct that Policy 202.1.1(b)(2) did not provide an exhaustive guide for police in their every conceivable encounter with animals—it is doubtful any policy could. But Plaintiff ignores that Policy 202.1.1(b) did not exist in a vacuum. It is undisputed that the policy was promulgated along with another policy requiring that every officer participate in training that provided nearly all of the information Plaintiff identifies as unconstitutionally omitted from the written policy. (Acevedo Decl. ¶ 10, Dkt. 87-1). Since this information had been supplied elsewhere pursuant to another APD policy, it is difficult to conclude that the purported omissions from Policy 202.1.1(b) were the moving force behind the alleged constitutional violation at issue here. To the extent any information was not provided in the training, such as the "best practices," Plaintiff neither identifies

these practices nor explains how their absence from the written policy rendered it constitutionally deficient.

The Court likewise finds Plaintiff's "structural" argument unconvincing. Though true 202.1.1(b)(2) directs officers to make advance contingency plans to employ non-lethal force where animal encounters are foreseen and 202.1.1(b)(1) does not, it is too far of a stretch to characterize this as an affirmative message that non-lethal force is *per se* impractical (and thus not expected) when an officer has no advance warning that an animal would be present. (*See* Pl.'s Resp., Dkt. 94, at 15–16). The suggestion is particularly untenable in light of 202.1.1(b)(1)'s statement that lethal force is appropriate "when lesser means would be impractical," and 202.1.1(b)(2)'s note that lethal force is nonetheless warranted if non-lethal means cannot be employed. (Policy 202.1.1(b), Dkt. 87-1 attach. B).

Because Plaintiff has not demonstrated that the policy is facially unconstitutional, he must show that the policy was adopted with "deliberate indifference to the known or obvious fact that . . . constitutional violations would result." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009). The Court's analysis of deliberate indifference with respect to Plaintiff's failure-to-train claim is equally applicable here, and the Court accordingly finds that this element is not satisfied.

Because Plaintiff has not produced sufficient evidence to create a fact dispute as to whether the Policy 202.1.1 was the moving force behind a constitutional violation, or that was it adopted with deliberate indifference to the fact that a constitutional violation would occur, the Court finds that Defendants are entitled to summary judgment on this count.[12]

5.    **Count 7: Procedural Due Process**

In Count 7, Plaintiff alleges a violation of his procedural due process rights. He asserts that he was wrongfully deprived of his property, Shiner Bock, without due process of law. The Court

_____

[12] The Court views the analysis of this section and the prior one as equally applicable to Plaintiff's individual-capacity claims against Acevedo.

previously addressed this claim on Defendants' motion to dismiss. (*See* Order, Dkt. 56, at 12–13). In its order denying dismissal, the Court noted that Plaintiff had adequately alleged that his deprivation of property was effected pursuant to an official policy, which ordinarily requires some pre-deprivation process that Plaintiff had not received. (*See id.*).

At this point, Plaintiff has provided evidence of only one policy—Policy 202.1.1, which empowered officers to use "objectively reasonable force" to neutralize a threat posed by a dangerous and aggressive animal. However, Plaintiff's allegations and evidence center on establishing that Walsh used objectively *unreasonable* force in fatally shooting Shiner Bock. If Plaintiff were to prove that Walsh acted unreasonably, thus violating Plaintiff's Fourth Amendment rights, Walsh's actions would be "random and unauthorized" in light of 202.1.1's mandate that he use only objectively reasonable force. *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981). In such a case, pre-deprivation process would not be required. *See id.* If, on the other hand, Walsh's actions were reasonable in light of an immediate threat to his safety, the exigency of the circumstances would also excuse a lack of pre-deprivation process. *See Kinnison v. City of San Antonio*, 699 F. Supp. 2d 881, 892–93 (W.D. Tex. 2010) (citing *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 677–80 (1971)).

On the basis of the evidence currently before it, the Court can only conclude that Plaintiff's deprivation took place under circumstances that do not require pre-deprivation procedures. As Plaintiff does not contend that he does not have access to adequate post-deprivation relief, the Court finds that Defendants are entitled to summary judgment on this claim.

6.      **Count 8: Texas Theft Liability Act**

In Count 8, Plaintiff asserts a claim against Walsh for theft under the Texas Theft Liability Act ("TTLA"), which provides that any person who commits theft is liable to the aggrieved plaintiff in the amount of actual damages and, in addition, further damages up to an amount of $1,000. Tex. Civ. Prac. & Rem. Code § 134.005. Defendants argue that this claim falls under the Texas Tort

Claims Act ("TTCA"), which provides government entities immunity against claims for intentional torts such as theft. The Court agrees.

Under section 101.106(f) of the TTCA, if a suit filed against an employee of a governmental unit concerning conduct within the scope of that employee's duties could have been brought under the TTCA against the governmental unit, it is to be asserted against the employee in his official capacity only and the claim must be dismissed as to the individual employee. Tex. Civ. Prac. & Rem. Code § 101.106(f). The scope of claims that "could have been brought" under the TTCA is not limited to common law torts. *See Rodriguez v. Christus Spohn Health Sys. Corp.*, 628 F.3d 731, 735 (5th Cir. 2010). Rather, according to the Fifth Circuit, claims fall under the TTCA if "(1) they are tort claims, and (2) they do not contain independent waivers of sovereign immunity." *Id.* at 735–36. Whether a claim sounds in tort "is ordinarily identified by examining the damages alleged: when the damages are purely economic, the claim sounds in contract, but a . . . claim alleging damages for death or personal injury sounds in tort." *Id.* at 736 (quoting *JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701 (Tex. 2008)).

There is no dispute that the TTLA does not contain an independent waiver of sovereign immunity, so the Court considers whether a claim under the TTLA sounds in tort. As noted above, the TTLA allows recovery of "actual damages" stemming from the theft. Tex. Civ. Prac. & Rem. Code § 134.005. The legislative history suggests that the actual damages are intended to be compensatory, allowing recovery for the "loss of property or related damages caused by a criminal offender." H. Res. Org., Bill Analysis, S.B. 269, 70th Leg., R.S. (1987). A claim for damages for damage to or loss of property sounds in tort. *See Bryant v. Stonegate Villas*, 142 F. App'x 809 (5th Cir. 2005) (per curiam) (holding that suit for property damages sounded in tort for limitations purposes); *Capitol One, N.A. v. Custom Lighting & Elec., Inc.*, No. H-09-3613, 2010 WL 4923470, at *4 (S.D. Tex. Nov. 29, 2010) (finding claim for compensation for property damage sounded in tort); *McKinney*

*Square Props. No. 1 Ltd. v. Seneca Ins. Co, Inc.*, No. 3:16-cv-956-M, 2017 WL 958608, at *2 (N.D. Tex. Mar. 13, 2017) (holding claim for damage to roof tiles sounded in tort) *see also* Tex. Civ. Prac. & Rem. Code § 16.003 (two-year statute of limitations for claims in the nature of a tort, including personal injury, trespass, conversion, and property damage). And indeed, the legislature clearly recognized the relation between a claim under the TTLA and a tort claim for conversion under the common law. *See* H. Comm. On Crim. Juris., Bill Analysis 1, Tex. S.B. 269, 70th Leg., R.S. (1987) ("Texas does not *statutorily* create civil liability for appropriating property belonging to another, although there is a common law action for the intentional tort of conversion.") (emphasis added).

On the other hand, Plaintiff contends that, because he is only seeking the statutory damages allowed by the statute, the remedy is more akin to a criminal fine than compensatory damages in tort. The Court disagrees. First, the plain text of the TTLA does not appear to provide authority to grant statutory damages as an independent remedy. *See* Tex. Civ. Prac. & Rem. Code § 134.005(a)(1). It provides instead that the statutory damages are to be provided "*in addition to* actual damages." *Id.* (emphasis added). Second, the seemingly punitive nature of the TTLA's statutory damages does not distinguish an action under the statute from a tort claim. On the contrary, the fact that the statutory damages are paired with actual damages recalls the traditional structure of punitive damages under Texas tort law, which holds that "[r]ecovery of punitive damages requires a finding of an independent tort with accompanying actual damages." *Fed. Exp. Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex. 1993).

Finding that TTLA claims against government entities and their employees fall within the scope of the TTCA brings this Court in line with the several state appellate courts that have considered the issue. *See, e.g.*, *Lopez v. Sena*, 414 S.W.3d 890, 893–96 (Tex. App.–San Antonio 2013, no pet.). While these decisions are not binding on this Court, the Fifth Circuit's decision in *Rodriguez* is, and this Court's analysis in accordance with *Rodriguez* leads to the same conclusion.

Additionally, a contrary holding would produce unusual results. It is difficult to imagine that the Texas Legislature sought in enacting the TTLA to cut a path around the TTCA's carefully crafted and limited waiver of sovereign immunity for what amounts to a statutory conversion claim—particularly without expressing such an intent. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 332 (5th Cir. 2002) ("It has long been settled that a state's waiver of its Eleventh Amendment immunity must be unequivocally expressed."). Further, the TTLA's legislative history demonstrates that the law was directed at concerns that the legal system was not adequately deterring theft crimes. H. Res. Org., Bill Analysis, S.B. 269, 70th Leg., R.S. (1987). With an aim of crime prevention in mind, it would hardly make sense to pass a statute that exposes law enforcement officers to personal liability for their constitutionally permissible seizures of property in performance of their duties.

Having concluded that TTLA claims against government employees fall within the scope of the TTCA, the Court must examine the impact of that conclusion on Plaintiff's claim. Because Plaintiff's allegations concern Walsh's actions "within the general scope of [his] employment" and "could have been brought under [the TTCA]," his claimed must be considered as if asserted against Walsh in his official capacity. Tex. Civ. Prac. & Rem. Code § 101.106(f). Section 101.106(f) mandates that, in these circumstances, Plaintiff's claim against Walsh must be dismissed. *See id.* While the statute contemplates allowing Plaintiff to amend his complaint to assert his claim against the City, the Court agrees with Defendant that such an amendment would be futile. Section 101.057 of the Civil Practice and Remedies Code excludes from the State's waiver of sovereign immunity any intentional tort. Tex. Civ. Prac. & Rem. Code 101.057(1).[13]

The above discussion establishes that Plaintiff's TTLA claim cannot proceed, and the Court therefore grants summary judgment in favor of Defendants on this claim.

---

[13] The fact that sovereign immunity bars Plaintiff's TTLA claim does not change that it may nonetheless be "brought under the [TTCA]." *See Franka v. Velasquez*, 332 S.W.3d 367, 379–80 (Tex. 2011).

**CONCLUSION**

For the foregoing reasons, the Defendants' Motions for Summary Judgment are

**GRANTED IN PART** and **DENIED IN PART**. Defendants are awarded summary judgment on

all claims except Count 2—Plaintiff's claim for unlawful seizure of his person.

       **SIGNED** on August 11, 2017.


_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE